No. 38,305

FLORENCE HARMON, *Appellee*, v. THE ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, a corporation, *Appellant*.

(233 P. 2d 489)

Opinion filed July 3, 1951.

*W. E. Treadway*, of Topeka, argued the cause, and *C. J. Putt, Henry Schulteis, Jr.*, and *J. B. Reeves*, all of Topeka, and *Walter F. Jones*, of Hutchinson, were with him on the briefs for the appellant.

*Roy C. Davis*, of Hutchinson, argued the cause, and *Frank S. Hodge, Eugene A. White* and *Robert Y. Jones*, all of Hutchinson, were with him on the briefs for the appellee.

The opinion of the court was delivered by

HARVEY, C. J.: This was an action for damages for personal injuries sustained by plaintiff when the automobile in which she was riding collided with a tender on defendant's engine at a grade crossing. A trial by jury resulted in a judgment for plaintiff. Defendant has appealed and contends, first, that its demurrer to plaintiff's evidence should have been sustained because of the failure of plaintiff's evidence to show actionable negligence on the part of defendant. Appellant further contends that in any event a new trial should be granted for alleged trial errors.

The record disclosed that east and west U. S. Highway No. 50 passes through the city of Hutchinson on Fourth street as it enters the city from the east. It is intersected at right angles by Halstead street. The center of Halstead street is the east city limits. In

or near the city there are large grain storage bins and other industries situated near Fourth street both to the north and south. The main line of defendant's east and west railway is about two-fifths of a mile south of Fourth street. Defendant has seven switch tracks which cross Highway No. 50 or Fourth street for the purpose of serving the industries in that area. The collision occurred on the second track from the east. This track serves, among other places, the Gano grain storage bins situated about 200 feet south of the highway. Just west of these bins are two tracks which as they proceed north and northwest run together, and a switch is situated about twelve feet south of the highway where cars can be switched from one of those tracks to the other. The track crosses the highway at an angle of 22.83 degrees west of north to the southeast. Just before the collision defendant's switch engine and tender, which were on the west one of the two tracks immediately west of the Gano storage bins, had backed to the north and northwest across the highway ready to be switched onto the track near to the storage bins. The car in which plaintiff was riding collided with it near the north side of the pavement.

Evidence on behalf of plaintiff may be summarized as follows: J. Clair Harmon, husband of plaintiff, testified he had lived in Hutchinson since 1911; that he is the senior member of the Harmon Furniture Company; that his first business experience was as an automobile mechanic for two or three years beginning in 1914. He was driving a Pontiac car which belonged to plaintiff at the time of the accident. His wife, the plaintiff, was sitting in the back seat just back of him, his son Harold was in the front seat with him, and his son Richard was sitting back of Harold. They were returning from a month's trip to New York and Chicago, where they transacted business connected with his store. The accident occurred about midnight July 12 and 13, 1947. They left Chicago at 6 a. m., or a few minutes later, stopped along the road for lunch, but did not stop for the evening meal. While he had lived in Hutchinson he had gone in and out of the town over Highway 50 "lots of times." He knew the situation with reference to the switch tracks. He had never been held up by a train on those tracks. The switch tracks across the highway are flat with the pavement. The track where the collision occurred is located in the center of Halstead street. They were driving west. As they approached the "Brown Wheel," two-fifths of a mile east of the place of the

accident, there was congested traffic, which caused him to slow down to 15 or 20 miles an hour and pull off the pavement. He did not remember clearly everything that happened after that up to the point of the impact. As near as he could tell he pulled back on the pavement and could see lights down the road and everything looked clear. That is as far as he can remember about it. That he had no independent recollection of applying the brakes. After he left the Brown Wheel and pulled back on the pavement he "honestly believed" that he was not going over 50 miles an hour. Up to the point where his memory was clear he kept a lookout in front for signs, and for vehicles. He recovered consciousness the next morning in the hospital. As a result of the accident the plaintiff was seriously injured. He further testified that the distance from Chicago to Hutchinson is about 735 miles; that he traveled the entire distance on July 12; that two grade crossings at railroad tracks were crossed in approaching Hutchinson that night, one just out of Strong City and the other at Burrton, at an average speed of 55 miles an hour; that he knew the speed limit in Hutchinson was 30 miles an hour; that as one approaches the city there is a federal railroad crossing sign on the righthand side of the highway, about 14 or 18 inches around, which was about 400 feet from the crossing; that there were city limit signs about 175 or 200 feet east of the crossing on the righthand side of the highway; that he knew the purpose of both signs, and "that he saw those two signs on the night of July 12"; that he passed the highway sign 400 feet east at about 45 or 50 miles per hour; that he had been in the automobile business and was acquainted with the mechanics of automobiles and that it would take around 185 or 200 feet to stop at 50 miles per hour; that as he approached Hutchinson the lights were adjusted for bright and would have revealed a vehicle or person 400 or 500 feet ahead of him. The car was a late 1946 or 1947 model, but a new car, had been driven only about 8000 miles, was in perfect mechanical condition, and that the tires were perfect.

Richard Harmon stated the maximum speed of J. C. Harmon while driving was between 50 and 55 miles per hour. He recalled approaching the Brown Wheel and the car slowing down there and pulling off to the side of the road; that the car picked up speed after that; that as the car approached the place where the collision occurred they noticed the most of the signs there; that they all knew that a railroad sign along the highway, a little round sign, was there;

that he knew in a general way that there were some switch tracks on Fourth street; that the road appeared to him to be clear; that he did not see anything on the highway until the brakes were applied, and that at that instant he did not definitely remember of seeing anything in front of him where he had previously seen a clear road. He did not know the length of the skid marks, did not observe any foreman or flagman or anyone with a lantern just before the collision, and did not recall hearing a whistle or bell. After the collision he noticed that the tender was clear across the highway. He did not recall anything about the engine and tender prior to the accident and after the brakes were applied—"everything happened so quick." He had been out along the highway on prior occasions and heard whistling for "the strawboard and what have you"; that he never saw a train on that switch track before. He was slightly hurt, but conscious and took Harold out of the car and helped remove his father. He testified as to other industries in that locality.

Harold Harmon testified he was occupying the front seat with his father at the time of the accident; that the car slowed down as they came to the Brown Wheel, after which his father accelerated the speed. He did not recall seeing the railroad sign as he came to it; that he looked in front and the road appeared to be clear until about the time the brakes were applied, then he saw "a black object, then 'Boom'."

John Robinson, chief of the detectives of the city of Hutchinson, heard of the accident by means of the police radio in his car and reached the scene shortly after it occurred. He took measurements of the skid marks and observed the engine and tender. Neither the switch engine nor car had been removed when he arrived. The tender was up to the north edge of the pavement. The skid marks measured 90 feet to the impact and 85 feet to the rear wheels. The skid marks were a steady line for a distance of over half way and from there on had breaks in them; that these breaks would mean one of two things—depressing and releasing the brake, or that the car had jumped. The east limits of the city are in the center of Halstead and Highway 50. There was a sign designating the city limits about 100 feet east and the standard highway crossing sign about 400 feet east of the crossing. The speed limit within the city is 30 miles per hour.

Phil Thrasher arrived at the scene of the accident shortly after

it occurred, having been summoned by police radio. The occupants of the car had been removed when he arrived. The railroad crossarm sign was located on the west of the tracks at which the collision occurred. He does not remember whether it was dark on the east side of the tender. A lot of traffic on the highway had arrived by that time. The light on the engine tender was burning.

W. L. Kirkuff, the office manager of the highway department, had drawn a plat to scale in the vicinity of Fourth and Halstead from measurements made on the ground. He testified the plat represents the switch tracks which cross Highway 50. The scale of the plat is one inch to 20 feet; that the distance to the city limits sign, which reads, "Hutchinson City Limits Speed Limit 30," is 134.2 feet east of the city limits; that the distance to the highway railroad sign is 381.7 feet; the distance from the track farthest east and the second track is 71 feet; that the only railroad crossarm sign is the one shown and located on the plat; that this sign is 12 feet high to the center of the cross and the cross extends two feet below and above the center; that he took measurements of the engine and tender and found the engine proper measures 37 feet long and the tender 27.3, making a total of 64.3 feet; that the tender is 10.2 feet high, with tank opening extending up another foot, for a total of 11.2 feet; that the distance from the switch down the second track to the north of the highway is 59.8 feet.

The deposition was received of Mrs. Barbara Moulder, the daughter of Robert Frank, who was living with her parents at the northeast corner of Fourth and Halstead at the time of the accident. She was in the living room when she heard the impact and her father then went outside. By that time people had started to collect. She noticed that the tender blocked the entire highway. The accident occurred on the second track, which is flat with the concrete highway. To the east there is a yellow and black sign that has reflectors on it. She doesn't know whether she heard the whistle of an engine at the time of the accident, but about that time she had noticed that the engine, before approaching the intersection, had always either whistled or rung the bell; that whistles are constant during the harvest season when they are moving box cars so much; that the whistles were quite noticeable, and a great number of men with lanterns; that she saw some box cars to the south of the highway on the east track, which extended to near the edge of the highway.

Robert Frank testified that he lives at Fourth and Halstead and his house is probably 20 feet from the easterly switch track; that the track on which the accident occurred is about 50 yards farther west; that he was in the house at the time of the accident and heard the brakes screech. He went from the house to within 60 or 70 feet of the accident and someone came on around from the rear of the tender and someone else came from the northwest. He did not know whether this second person had a lantern. He then went to call an ambulance. He had seen no other cars come up by that time. He thought there was a whistle before the crash, but he had no idea how long before. He didn't notice any box cars south of the highway. He had heard whistles of switch engines in that vicinity when no crossing was being made. The main line tracks are about two-fifths of a mile south of Fourth and Halstead; that prior to the accident he had seen cars switch across the highway. After the accident he noticed more whistling and flares.

Mrs. Sumwalt, a widow, residing in Hutchinson, testified that she arrived soon after the accident; that she and her "boy friend" approached the crossing from the west. She was asked by the engineer to stay with Mrs. Harmon until the ambulance came, and she did. It was very dark and she did not recognize Mrs. Harmon until she struck a match. Mrs. Harmon was lying on the shoulder of the road. They drove around back of the engine and she believed that they drove partly off the pavement.

Wilbur L. Bybee testified that he was a switchman with the Santa Fe and a member of the crew at the time of the accident. The other members were switch foreman, Joe Mullett; field man, Fred Tullis; fireman, Bill Moran; and engineer, Hawkins. He was pin puller and was on the engine as they came toward the intersection. It was on the west of the two tracks that are parallel and directly to the west of the Gano elevator. The engine was backing to make a switch in order to come onto the other track. He was riding the right front footboard of the engine as it was backing. In order for the switch to be accomplished the front driver wheels had to clear the points of the switch track in order to throw the switch, which was located south of Highway 50 and east of Halstead street; that as the engine backed he gave the engineer a signal to stop as the driver wheels got a little past the switch, and he stepped off of the footboard just as the engine stopped, and then heard a noise. The engine had traveled maybe three or four

feet after he had given the signal; that as the engine was approaching and coming into the highway it was not moving over a walking speed; that when he heard the noise he went around to see, and at the rear of the tender he saw the automobile rammed into the left rear corner of the tender. When he heard this noise it was simultaneous with the stopping of the engine and tender. The fireman was in the cab of the engine on the left side, which would be on the east side. Tullis was at the elevator; he did not know where Mullett was. He had come on duty at 11 p. m. and worked only an hour when the accident happened. He had been working for the Harmons since September 3, 1947, for about a year, but did not discuss the accident with any of the Harmons during the time he worked for them. He further testified that the locomotive and tender on this occasion had both head and rear lights, which were burning; that as it approached the intersection the whistle was blown. The whistle started when the locomotive was two or three car lengths away, or just after it left the elevator, and that he heard the bell ringing; that the bell started ringing before the whistle blew and continued after the whistle; that the locomotive was a steam type, coal-burning engine; that the grates from the locomotive could throw a red glow on the ground at night, and he had seen them do so; that he did not know whether there was any difference between the lights at the front and at the rear of the tender, and that the light at the rear of the tender is on a stand above the tender about three feet. He identified the locomotive in a picture and stated the rear headlight shown in the picture is the one he had described.

It was stipulated that the railroad company drafted the plans and had constructed the two tracks on the west side of the Gano elevator, and the switch tracks and switch, about 1932.

A traffic flow map and survey of the State Highway Commission was admitted in evidence, also a chart showing the distance required to bring an automobile to a stop at different speeds, also typewritten statements concerning plaintiff's hospitalization and treatment, signed by several doctors.

W. C. Baisinger testified he was superintendent of the Western Division of the Santa Fe at Dodge City and brought with him the Standard Code of the Association of American Railroads Operating Rules. He identified one of the rules, which reads:

"When cars are pushed by an engine and the conditions require a trainman must take a conspicuous position on the leading car and when shoving over

public crossings at a grade not protected by a watchman or by gates, a member of the crew must protect the crossing."

He testified the Santa Fe has a similar rule.

The plaintiff testified that during the 30 years in which she had been married to Mr. Harmon she had often ridden with him in automobiles and that she felt very safe in riding with him. She further testified that she recalled that when they came to the Brown Wheel there were cars coming; that her husband slowed his car for the others to proceed. After the cars left they had the highway clear and picked up speed; that she looked down the highway, as she always does, and watched for anything and saw nothing and thought the road was perfectly clear; that she woke up in the hospital; that she did not recall the brakes being applied.

Defendant demurred to plaintiff's evidence upon the ground "that the plaintiff has failed to prove any cause of action against the defendant"; also upon the ground of contributory negligence of the plaintiff, but we do not go into that.

In plaintiff's petition the alleged acts of negligence of defendant are stated at length and in much detail. Instead of setting them out as stated in the petition we use the summary of them as stated in the court's instructions, to which there appears to be no complaint, as follows:

"1. That the method in which the tracks were laid out and the switch and sidings installed made it necessary for an engine to block a busy highway in order to switch from one of these two parallel tracks to the other."

In the presentation of plaintiff's case it was stipulated that defendant constructed these tracks and the switch in 1932, about fifteen years prior to the accident here involved. In plaintiff's petition it was alleged they had been used frequently since they were installed. There is no suggestion in plaintiff's evidence that any accident had ever occurred by reason thereof prior to the one here in question. We think it well settled a railroad company has the right to construct upon its right of way any tracks, switches and cross tracks which it deems necessary for the proper conduct of its business, even though they cross highways or streets where there is vehicular or pedestrian traffic. There is no suggestion in plaintiff's evidence that these tracks and switch were installed and used contrary to any statute or to the rules and regulations of any federal or state board or commission which has anything to do with the matter. The result is that the fact of the switch and tracks being installed and used does not tend to prove negligence of defendant.

"2. That the defendant failed to erect or maintain a railway crossing sign to the east of these tracks to warn those approaching from the east and that the sign which was erected was west of these tracks and was dim, old and worn and not lighted."

We think the location of this sign had no causal connection with the accident. The rule is well stated in *Corkill v. Thompson*, 169 Kan. 38, 217 P. 2d 273, where it was held:

"The purpose of highway signs or signals indicating a railroad crossing is to warn of approaching trains and not of trains already occupying the crossing."

In the opinion is cited our earlier cases of *Jones v. Atchison, T. & S. F. Rly. Co.*, 129 Kan. 314, 282 Pac. 593; *Sheets v. Baldwin*, 146 Kan. 596, 73 P. 2d 37; *Bledsoe v. M.-K.-T. Rld. Co.*, 149 Kan. 741, 90 P. 2d 9; *Shepard v. Thompson*, 153 Kan. 68, 109 P. 2d 126. Each of those cases cites additional authorities. Neither is the fact that the sign was "dim, old and worn" of any importance. If the contention that the sign was not lighted is intended to mean that the sign itself did not have lights upon it we think it never has been the practice, or any authorized requirement, that such signs should have lights on them. If the contention means that the area of the sign was not lighted, we know of no statutory or other requirement requiring such light. In this case, however, the tender of the engine had on the rear a light which we understand to be a standard headlight of a locomotive. As it backed across the street it would naturally light up a considerable area to the north and west. More than that, the evidence in behalf of plaintiff, and by the plat introduced in evidence, disclosed that this sign could have been seen by one in an automobile approaching from the east for a distance of as much as 590 feet, even if the tender of the engine had been entirely across the highway. More than that, the driver of the automobile in which plaintiff was riding was familiar with the crossing, as were perhaps the other occupants of the car. Aside from these secondary considerations just mentioned the presence of the tender on the track was a sign and warning to all approaching it irrespective of the presence or absence of the crossarm sign.

"3. That although the defendant's employees saw and observed the approach of the automobile, they nevertheless continued on to and across the highway and into the path of the automobile."

This point is not well taken for the simple reason that there was no evidence presented on behalf of plaintiff which showed, or tended to show, that any employee of defendant saw and observed the approach of the automobile. The only member of the switch-

ing crew called by plaintiff to testify was Bybee, who was on the front end of the engine until he got off to turn the switch. He did not testify that he saw the automobile approaching. W. M. Moran, a member of the switching crew and the fireman, called to testify by defendant, did testify to seeing the automobile in question approaching. This testimony, of course, cannot be considered in passing upon a demurrer to the evidence. More than that, if it were considered it would not be helpful to plaintiff. Joe Mullett, the foreman of the switching crew, was not living at the time of the trial and his deposition had not been taken. No one called as a witness on plaintiff's behalf testified to what Mullett did or did not see. The result is that the evidence offered on behalf of plaintiff wholly fails to establish this ground of negligence.

"4. That the defendant failed and refused to cause a flagman or a crewman to warn the traffic of the approach of the locomotive and failed to use any lights or flares for such purpose, and failed to use the whistle in time to warn the approaching traffic in time to avoid a collision."

No witness called by plaintiff testified that a flagman or crewman was not out in the street to warn approaching traffic. There was evidence of defendant tending to show that Mullett, the foreman of the switching crew, was out in the street with a lighted lantern performing the very duties it was alleged were not being performed. But, again, we cannot consider this evidence on the demurrer to the evidence. We must and do leave it with the statement that the absence of a flagman or crewman to warn the traffic was not supported by any testimony or other evidence offered on plaintiff's behalf. Pertaining to the contention that defendant failed to use any lights or flares for such purposes, we see no evidence in the record, other than the fact that a collision occurred, that there is any necessity of using flares or lights other than the lights that were being used. The contention that defendant failed to use the whistle was thoroughly disproved by the testimony of the witness Bybee, called by plaintiff. He testified not only that the whistle was blowing, but that the bell was ringing.

The result of this analysis is that there was no substantial, competent evidence to establish negligence of the defendant.

There is not much else to this lawsuit. Defendant in its answer did not plead contributory negligence of plaintiff, but after she had testified that was included as a ground for the demurrer to plaintiff's evidence. Much of the brief, particularly the brief of ap-

pellee, is devoted to this question. In view of our conclusion that plaintiff's evidence shows no actionable negligence of defendant it is not necessary to discuss plaintiff's contributory negligence, and we base no decision thereon.

By a cross appeal appellee contends the trial court erred in not giving her requested instruction respecting wantonness and refusing to submit that question to the jury. We see nothing in the record, and certainly not in plaintiff's evidence, to indicate wantonness on the part of defendant or its employees; hence, the trial court did not err in refusing to submit that question to the jury.

Counsel for appellee in their brief argue the doctrine of the last clear chance. By doing so they concede negligence of plaintiff, but we give no force to this for we find nothing in the evidence that would justify the application of the doctrine of last clear chance.

Counsel for appellee speak of the heavy traffic on U. S. 50. Whatever the traffic may have been at other times plaintiff's evidence clearly discloses that there was no other traffic on the highway after the automobile in which plaintiff was riding passed the Brown Wheel from either the east or the west. Directly after the collision one car came from the west. If there were standing cars on the first track south of the highway there is no indication that was a traffic hazard. None of the occupants of the car testified to seeing them.

Counsel for appellee in their brief talk about the question of joint tort feasor and the right of plaintiff to sue one or both of them, referring, as we understand, to the negligence of the driver of the automobile in which plaintiff was riding, alleged in defendant's answer, and the negligence of the railway company. This argument would have some force if the railway company were negligent, but since it is not, as we hold, the discussion is without merit.

We predicate our decision upon our holding that plaintiff's evidence discloses no actionable negligence of the defendant, as hereinbefore discussed.

Counsel for appellant have presented and argue a number of alleged trial errors. While our tentative view is that some of these would require a reversal for a new trial we have no occasion to go into them here in view of our holding that no actionable negligence of defendant was shown by plaintiff's evidence. It would be no kindness to any of the parties to this action to reverse the case for trial errors.

The result of what has been said is that the judgment of the trial court must be reversed with directions to render judgment for defendant.

It is so ordered.