Randy D. ADAMSON, a Minor, by and through his Guardian, Union National Bank of Wichita, Appellant,

v.

MIDLAND VALLEY RAILROAD COMPANY, Appellee.

No. 8749.

United States Court of Appeals Tenth Circuit.

Aug. 17, 1967.

Rehearing Denied Dec. 5, 1967.

Emmet A. Blaes, Wichita, Kan. (Roetzel Jochems, Robert G. Braden, J. Francis Hesse, James W. Sargent, Stanley E. Wisdom, Cecil E. Merkel, Harry L. Hobson, Bruce W. Zuercher, L. D. Klenda, Charles M. Cline, Richard A. Loyd, Stephen M. Blaes and Jack S. Ramirez, Wichita, Kan., on the brief) for appellant.

Donald R. Newkirk, Wichita, Kan. (Wayne Coulson, Paul R. Kitch, Dale M. Stucky, Gerrit H. Wormhoudt, Philip Kassebaum, John E. Rees, Robert T. Cornwell and Willard B. Thompson, Wichita, Kan., on the brief) for appellee.

Before PHILLIPS, LEWIS and HILL, Circuit Judges.

HILL, Circuit Judge.

Appellant sued below to recover from appellee damages for injuries sustained when the car in which he was riding ran into appellee's train at a crossing in Arkansas City, Kansas. There were two jury trials. In the first, the jury rendered a verdict against appellee, awarding appellant $47,224.70. The court then denied appellee's motion for a directed verdict but granted its motion for a new trial on the ground that the court had misinstructed the jury on what it could consider in deciding whether or not the crossing was "unusually dangerous." In the second trial the jury found for appellee. Appellant contends: (1) That it was error for the court to grant a new trial and (2) that the jury was coerced by the court into arriving at a verdict in the second trial.

The accident occurred at about 11:30 p. m. on June 8, 1963, at the point in Arkansas City where "D" Street crosses the Midland Valley Railroad tracks. Appellant, a three-year old boy, was riding in the back seat of a car driven by his mother and going south down "D" Street when it ran into appellee's train. "D" Street is a north-south street and the Midland Valley tracks run in a east-west direction at the crossing. The evidence indicated that at the time of the accident, appellee's engine, moving backwards, was slowly (from 1 to 4 miles an hour) pushing a box car westward across "D" Street.

A pertinent fact here is the location of a city street light on "D" Street 132 feet north of the railroad tracks where the collision occurred. There are six sets of tracks at this crossing and the area is flat. A small canal bridge is located between the first two and the last four sets of tracks approaching from the north. There is another street light located south of the tracks on "D" Street. As approached from the north the train was on the third of the six sets of tracks, which is 35 feet south of the canal bridge. To the northeast of the crossing is one Santa Fe rail yard and to the southeast another. These yards are connected by tracks which run parallel to "D" Street 280 feet east of it. There are numerous tracks at each of the Santa Fe yards and the evidence established that there is a great deal of railroad activity in the whole area and that whistles had been blowing and bells ringing all evening June 8, although appellant's mother gave no testimony that she was distracted by the noise.

Appellant's mother, shortly after the accident and later in a deposition, said she was traveling 45 or 50 miles per hour. At the time of the trial she testified that after that deposition had been taken she had performed an experiment at the crossing with another car, that she did not know "about speeds and that she now felt she was traveling 35 miles per hour, or maybe a little more." Mrs. Adamson applied her brakes prior to the collision, left skid marks in excess of 60 feet in length and her car skidded sideways before striking the engine. At the point of impact, "D" Street is approximately 21 feet wide. The box car that had already passed through the intersection was 45 feet long and the engine 56 feet 9 inches long. The point of impact was approximately 32 to 44 feet from the west end of the engine. There was no flagman on the north side of the tracks at the time the accident occurred.

Appellant first contends that the instruction to the jury enumerating what it could consider in determining whether the crossing was unusually dangerous was proper in all respects and that the court erred in setting aside the first verdict. Appellee, in supporting the result of the trial court's action, contends that it was entitled to a directed verdict in the first trial and that appel-

lant thus cannot complain about the court setting aside the verdict and granting a new trial. In making this position appellee relies on Kansas' well-recognized "occupied crossing" rule which dictates that "ordinarily the presence of a train on a crossing is of itself an adequate warning to a driver of a vehicle on a highway and special safeguards need not be employed * * *." [1] Appellee thus contends that, as a matter of law, it was not negligent. However, excepted from this rule are those cases which involve "unusually dangerous" crossings; and when that is the case, consonant with the dictates of common prudence, the railroad has a duty to use reasonable means to warn highway travelers.[2] Appellee has suggested the rule has no application to a true "occupied crossing" case but applies only to "race to the crossing" cases.

As was the experience of appellee, we have found but one Kansas case which holds under the evidence in the case that the dangerous crossing issue should go to the jury and that was the "race to the crossing" case of Johnson v. Union Pacific Railroad Co., 157 Kan. 633, 143 P.2d 630. On the other hand, we have located no case which holds that the "unusually dangerous" doctrine is not to be applied in a proper "occupied crossing" case. Indeed, in the recent "occupied crossing" case of Grisamore v. Atchison, Topeka and Santa Fe Railway Co., supra 403 P.2d at 98, the Kansas Supreme Court expressly said that "Where a crossing is unusually dangerous such reasonable care must be exercised by the railroad as common prudence dictates. Where a standing train is blocking a crossing it is under a duty to use reasonable means to warn and avoid injury to the traveling public."

In supporting its contention that it was entitled to a directed verdict, appellee next argues that the evidence presented in the case at bar does not support the submission of the "unusually dangerous" crossing issue to the jury. It is the rule that unless "substantial, competent" evidence is introduced at the trial showing the dangerous character of the crossing, the question is one of law for the court.[3] Once such evidence has been introduced the question is properly submitted to the jury as one of fact. The trial court recognized its duty in this regard and in his memorandum opinion granting appellee's motion for a new trial he commented that "there was substantial, competent evidence that the crossing was unusually hazardous, requiring the question to go to the jury. * * * I remain convinced that a directed verdict for the defendant, either at the time of trial or now, would have been error."

Appellee contends there was no substantial, competent evidence that the crossing was unusually hazardous. Although the case is close we think that the trial court was correct in giving the issue to the jury. In Johnson v. Union Pacific Railroad Co., supra 143 P.2d at 634, the Kansas Court said that among things to be considered in determining the existence of an "unusually dangerous" crossing were "the noise of industry thereabout which deflected or muffled the sound of railway engine bell or whistle, * * * the many railway tracks thereabout, and the moving of switch engines and freight cars thereon". We think the evidence established enough "substantial, competent evidence" of some or all of these elements to let the issue go to the jury.

At the first trial, the "unusually dangerous" crossing instruction given by the

---

1. Grisamore v. Atchison, Topeka & Santa Fe Railway Co., 195 Kan. 16, 403 P.2d 93, 97; Harmon v. Atchison, Topeka & S. F. Rly. Co., 171 Kan. 403, 233 P.2d 489.

2. That exception, as applied by the decisions of the Kansas Supreme Court, is hereinafter discussed.

3. Grisamore v. Atchison, Topeka & Santa Fe Railway Co., supra; Bledsoe v. Missouri-Kansas-Texas Rld. Co., 149 Kan. 741, 90 P.2d 9; Corkill v. Thompson, 169 Kan. 38, 217 P.2d 273.

trial judge included the statement that[4] " * * * In determining whether or not the crossing was unusually dangerous you may take into consideration any factors which you find obstructed Mrs. Adamson's view of the crossing, if any, such as the positions of the street lights and you may consider whether or not the crossing was a much traveled one, the noise if any, incident to nearby railroad operations, the location of the crossing in the city, and all surrounding facts and circumstances existing at the time of the collision." The trial judge concluded he should not have specifically told the jury it could take into consideration the position of the street lights and that he should not have permitted the jury to consider the weather conditions by permitting consideration of "all surrounding facts and circumstances * * *." As to the street lights, the trial judge concluded that Kansas had not spoken directly to this problem and that he would have to rely on "the general law," which he felt required there be "actual objects" preventing the driver from seeing the danger. The trial judge said: "Moreover, the real substance of the plaintiff's position on the matter of the street lights was not that they obstructed the view of the driver, but that their position created a darkness, or 'void,' at the intersection. Plaintiff's own testimony was that there was nothing to obstruct the vision of one driving south on 'D' Street * * * except darkness. Kansas has considered the effect of darkness and has stated unequivocally that it does not impose a greater duty on a railroad at a highway crossing. Jones v. A. T. & S. F., supra [129 Kan. 314], at 315 [282 P. 593]."

Grisamore v. Atchison, Topeka & Santa Fe Railway Co., supra, was decided after the trial judge sustained appellee's motion for a new trial. Grisamore arose out of a crossing accident in Wichita in which plaintiff's decedent was killed when the truck he was driving struck a railroad car which was blocking the street crossing. The appeal was from a judgment sustaining the defendant railroad's demurrer to the petition. While we are here concerned with the sufficiency of the evidence to establish a jury question rather than the sufficiency of the petition as against a demurrer, we think the recent case is helpful in setting out the relevant considerations in a railway crossing accident. Grisamore reiterates that the railroad is not considered an insurer of the safety of motorists approaching their tracks; however, the railroad must exercise due care for the safety of such travelers. This duty of the railroad is directly affected by the care required of the motorist. If the motorist could have seen a hazard, such as a railroad car blocking his path, and avoided a collision had his automobile been in good condition then the railroad has no obligation which

---

4. The entire instruction is as follows:

"If, under all the evidence introduced in this case, you find that the circumstances and conditions surrounding the crossing of "D" Street and the defendant's tracks were such as to make it unusually dangerous at the time in question, then you should determine whether a reasonably prudent person under such circumstances would have maintained a flagman at the crossing at the time of collision or would have given notice or warning to travelers on the highway by lights or signals on the train. In determining whether or not the crossing was unusually dangerous you may take into consideration any factors which you find obstructed Mrs. Adamson's view of the crossing, if any, such as the positions of the street lights and you may consider whether or not the crossing was a much traveled one, the noise if any, incident to nearby railroad operations, the location of the crossing in the city, and all surrounding facts and circumstances existing at the time of the collision.

"If after due consideration of all such circumstances, you find that the crossing was an unusually dangerous one and if you further find that a reasonably prudent person would have maintained a flagman at the crossing at the time of the collision or would have given notice or warning to travelers on the highway by lights or signals on the train, then you are instructed that failure to so maintain a flagman or to give such notice or warning would be negligence on the part of the defendant."

could result in its negligence.[5] If, however, unusual conditions prevail at some crossing the railroad may be required to anticipate that the mere presence of the train will not warn the motorist and the railroad must then take steps to warn the motorist.[6]

 Of particular interest to the instant case are the following paragraphs from Grisamore:

"Where a crossing is unusually dangerous such reasonable care must be exercised by the railroad as common prudence dictates. Where a standing train is blocking a crossing it is under a duty to use reasonable means to warn and avoid injury to the traveling public. The character of the means will depend on the particular conditions and circumstances surrounding the crossing. A railroad may be liable for injuries received by a motorist colliding with a railroad car on a crossing where normal headlights do not reveal the obstruction or where a trap is created by an illusion of safety revealed by the headlights." [7]
Later in the opinion the court states that "It would appear * * * that where a crossing is unusually hazardous the question of whether a driver of a motor vehicle is guilty of contributory negligence is a question of fact * * * if the vision of the motorist approaching the crossing is affected by street lights near the crossing or on opposite side of crossing * * *." [8]

Appellant, relying heavily on the Grisamore case, contends that the testimony of two of its witnesses—Mrs. Adamson, the driver of the car, and Roy L. Morgan, a resident of Arkansas City familiar with the crossing—"clearly indicates that at this crossing normal headlights do not reveal an obstruction on the crossing; that the vision of an approaching motorist is affected by street lights near the crossing; that the street lights create a trap, an illusion of safety; that an existing obstruction is not revealed by the headlights." Mrs. Adamson testified that she did not see the train on the crossing until she "got under that light," that "you certainly couldn't see it until after you got past that light, that first light." Morgan, who had lived in the area all of his 34 years, testified that between the light post on the north of the tracks and that on the south of the tracks "there is the darkest one spot in the world. There is nothing that interferes with your line of sight. There is nothing to keep your line of sight from looking down, there is nothing to keep your headlights from shining down there if you are driving an automobile if you have got headlights that work. * * *." [9]

 We think the court correctly concluded that all that was established was the existence of a dark spot beyond the illumination of the first light. The Kansas Court has expressly said that the duty owed by a railroad is not increased

5. "The duty of a railroad to a motorist approaching a crossing is directly affected by the care required of the motorist. If the motorist would have been able to see the hazard had he looked and been able to avoid the collision had his automobile been in proper condition and under proper control, the railroad has no obligation which could result in its negligence." Grisamore v. Atchison, Topeka & Santa Fe Railway Co., supra 403 P.2d at 97.

6. "Although railroads are not insurers of the safety of persons approaching their tracks for the purpose of crossing, they must exercise due care for the safety of travelers at public crossings. This anticipates the exercise of ordinary care depending on the situation and surroundings at the crossing. Unusual dangerous conditions prevailing at the crossing may require the railroad to anticipate that the mere presence of the train standing thereon will not adequately warn users of the highway. Such special conditions may create an unusual hazard making additional warnings necessary." Grisamore v. Atchison, Topeka & Santa Fe Railway Co., supra 403 P.2d at 98.

7. Grisamore v. Atchison, Topeka & Santa Fe Railway Co., supra 403 P.2d at 98.

8. Grisamore v. Atchison, Topeka & Santa Fe Railway Co., supra 403 P.2d at 100.

9. The quotations are from the Transcript of Record on Appeal, which, pursuant to Rule 75(c), F.R.Civ.P., is in narrative form.

because of darkness.[10] There is nothing in the Grisamore case to indicate that this rule has been changed. We agree with the trial judge that in this case, the real substance of the plaintiff's position on the matter of street lights was not that they obstructed the view of the driver, but that their position created a darkness or "void." Therefore, the second of the above quoted paragraphs from Grisamore is not applicable since here the question was whether the headlights could pierce the darkness beyond the street light and not whether the street light affected the vision of the motorist. We conclude that, under the facts of this case, the trial court committed no error in his decision to grant a new trial on the basis that he had improperly instructed the jury that they could consider "the position of the street lights." We are not saying that, in a proper case, the jury cannot consider the position of the street lights, such as where "the vision of the motorist approaching the crossing is affected" by such lights, but only that, in this case, it was not proper to so instruct.

Aside from the noise and switching activity in the area, there was very little evidence showing an "unusually dangerous" crossing and unless the jury found the crossing was "unusually dangerous" they were bound, under the law as properly instructed by the court, to find for the appellee. Thus, injecting the issue of lighting into the case was prejudicial error and the court was correct in granting a new trial because of it. Because the action of the court in granting a new trial is amply supported by what we have already said, we think it unnecessary for us to consider appellant's contention that the trial court was wrong in concluding that, by permitting the jury to consider "all the surrounding facts and circumstances" he erroneously let it consider weather conditions, although we do note

in passing that this seems a rather too technical distinction.

This brings us to appellant's contention that the trial court coerced the jury in its deliberations in the second trial. After the jury had deliberated almost two and one-half days, they sent a note to the court indicating they were deadlocked. They were then returned to the courtroom and the trial judge gave them an additional "Allen" instruction, in which he told them that he did not want them "to feel that there is any pressure being put on you by the Court either way," that it was not an easy case, that "I want to emphasize the fact that I do not want the conscience of the jurors strained," that if there was any hope of their arriving at a verdict, "I think everyone would want you to spend another hour and see what you can do, but I don't want you to do it on the basis of any pressure from the Court," that "getting up and moving around a little bit might make a difference," but he re-emphasized that he did not want to put any pressure on the jury. He then said: "I would like to give you a chance. I am going to be here, anyway. But if you don't think there is any chance, why, then I am going to excuse you and declare—or the Court will take whatever other steps it has to take. Now, Mr. Foreman, what do you think?" The foreman replied: "Give us until 5:00 o'clock, Your Honor, and we will try." The Judge then said, "All right. I will give you until 5:00 o'clock and, as I say, I want no pressure on you, and you remember my instructions. That is the thing I remind you of all the time. I will give you until 5:00 o'clock. Why don't you retire and give it further thought." The jury then retired. Appellant claims the court forced them to arrive at a verdict by 5:00 o'clock. Appellant cannot complain about the instruction because he did not object to it as required by Rule 51, F.R. Civ.P.[11] but we note, nonetheless, that it obviously was not coercive but merely re-

---

10. Jones v. A. T. & S. F., supra.

11. Chiodo v. General Waterworks Corp., 10 Cir., 380 F.2d 860, and cases cited therein in footnote 2.

quested the jury to try—without compulsion—until 5:00 o'clock, the time they normally ended deliberation and the time the foreman had suggested they stop.

Affirmed.